Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 7618 | **DATE** | 8/3/2000 |
| **CASE TITLE** | Talano, M.D. vs. Northwestern Medical Facility | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons set forth above, this court grants defendant's motion for summary judgment. This is a final judgment.

(72-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | ED-7 FILED FOR DOCKETING 00 AUG -3 PM 5: 25 | | C\O |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| TP | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES V. TALANO, M.D. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 97 C 7618 |
| | ) |
| NORTHWESTERN MEDICAL FACULTY | ) Judge John A. Nordberg |
| FOUNDATION, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff James V. Talano has filed a claim for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") and a claim for breach of contract. He alleges that the defendant took a number of actions – including cutting his salary, removing his secretary of many years, and changing his office – designed to make him resign from his job as a cardiologist and that these actions were motived by age discrimination.

This court previously granted partial summary judgment to the defendant, holding that all but two of the acts underlying the age discrimination claim were untimely because they occurred more than 300 days before plaintiff filed his claim with the applicable state agency. *See* 1/19/99 Order. Defendant has now filed a second summary judgment motion, in which it seeks judgment on the remaining two acts underlying the age discrimination claim and on the state law breach of contract claim. For the reasons set forth below, the motion is granted.

-1-

## BACKGROUND

The following facts are undisputed unless otherwise noted. Defendant Northwestern Medical Faculty Foundation, Inc. ( the "Foundation") is an Illinois not-for-profit corporation that consists of physicians most of whom are on the faculty of Northwestern University Medical School (the "Medical School"). Pursuant to a contract, the Foundation supplies cardiologists to patients at Northwestern Memorial Hospital (the "Hospital"). Although the Foundation, Medical School, and Hospital work together in a complex interrelationship, they are separate entities.

Dr. James V. Talano is a cardiologist who specializes in echocardiography, which is the use of ultrasound to map heart tissue. In 1977, he joined the faculty at the Medical School and became the medical director of the echocardiography unit and laboratory, which were part of the Division of Cardiology at the Hospital.

In 1982, Dr. Talano and the Foundation's predecessor entered into an employment agreement. This agreement is a four page letter agreement and is dated January 1, 1982. It was countersigned by Dr. Talano on June 1, 1982.

In 1986, Dr. Talano was named the Lester B. and Francis T. Knight Professor, which was a newly endowed professorship created at the Medical School with funds provided by one of Dr. Talano's patients.

In 1992, the Foundation sought to hire a new Chief of the Division of Cardiology. Although Dr. Talano applied for the job, it was given to Dr. Robert Bonow, who then became Dr. Talano's immediate supervisor. Dr. Talano has admitted that he was somewhat disappointed he did not get the job. From the beginning, there was a difference of opinion between Dr. Bonow and Dr. Talano as to how the Division should be run.

By early 1995, Dr. Bonow came to believe that Dr. Talano was not leading the echocardiography laboratory effectively. Dr. Bonow says that he lost trust and confidence in Dr. Talano based on the following reasons: (i) Dr. Talano allegedly was tardy for patient appointments, sometimes missed appointments, and inappropriately asked others in the division to cover for him: (ii) Dr. Talano allegedly was encouraging patients to fill out patient satisfaction surveys in a negative way; and (iii) Dr. Talano allegedly lied about ceasing his relationship with a group called Chicago Cardiovascular Associates.

Dr. Talano responds that these reasons are pretextual, designed to cover up the fact that the Foundation and Dr. Bonow were engaging in illegal age discrimination. He also points out that, during this general time period, he was the president of the Northwestern Medical Faculty Senate, a position elected by his peers, and that he had one of the largest patient bases of any doctor in the division.

In March of 1995, Dr. Bonow recommended to the Hospital's Board of Directors that Dr. Talano be removed as medical director of the echocardiography unit and laboratory. The Hospital Board agreed with and adopted this recommendation. In conjunction with this removal, the Foundation reduced Dr. Talano's salary by $28,000 (from $204,880 to $176,880), relocated him from his office of 19 years, and reassigned his secretary who had been with him for 8 years.[1]

On July 13, 1995, Dr. Lewis Landsberg, writing on behalf of the Medical School, informed Dr. Talano that the Lester B. and Francis T. Knight Chair in Cardiology was one

---

[1] Dr. Talano states that his new office was a "converted storeroom" in a separate building from his colleagues. The Foundation admits that it moved Dr. Talano's office to a separate building but rejects his characterization of that office as being either substandard or inconvenient.

-3-

dedicated to the director of the echocardiography unit and that this Chair would now rotate to the new director, effective August 7, 1995. In August of 1995, Dr. Talano's salary was further reduced to $132, 401. Also, in August of 1995, Dr. Bonow distributed the schedule for the 1996 service rotation at the Hospital. Dr. Talano's name had been removed from this schedule.[2]

As a result of the above actions, on August 2, 1995, Dr. Talano's legal counsel wrote a letter to the Foundation threatening to sue for age discrimination. Counsel stated in this letter that all of the above acts "constitute[d] a direct and notorious violation" of the Age Discrimination Employment Act.

In February of 1996, Dr. Bonow notified plaintiff that, effective March 1, 1996, he was assigning him to be in charge of the echocardiography laboratory at the Veteran's Administration Lakeside Medical Center ("VALMC"). Dr. Talano alleges that this move would have limited his ability to conduct his cardiology practice at the Hospital and would have generally discredited and disgraced him. However, Dr. Talano refused this assignment and thus never worked at the VALMC laboratory.

Effective May 1, 1996, Dr. Talano resigned from his position at the Foundation. He then took a job as Chief of Cardiology at Tulane University.

---

[2]Assignment to the service rotation schedule requires a cardiology division member to be on 24-hour call to see patients on an as-needed basis at the Hospital. The rotation typically lasts for no more than four weeks in any six-month period. Plaintiff asserts that service rotations are one of the primary ways to obtain new patients. The Foundation disputes this characterization.

## ANALYSIS [3]

### I. Age Discrimination Claim.

As noted above, as a result of this court's earlier summary judgment ruling, there are only two acts still remaining in this case that may be used to support the ADEA claim: (1) the failure to include Dr. Talano on the 1996 service rotation schedule; and (2) the proposal to make him the director of the VALMC laboratory. Defendant sets forth a number of different procedural and substantive reasons why each of these acts is insufficient to survive summary judgment. We will not discuss all of these arguments, nor will we consider the central question of whether there is sufficient evidence for a jury to conclude that the defendant was engaged in age discrimination, because we find that each act suffers from a particular preliminary defect, as more fully described below.

#### A. Removal From The Service Rotation.

The Foundation argues, among other things, that the removal of Dr. Talano from the 1996 service rotation is not actionable because it took place more than 300 days before Dr. Talano filed his discrimination claim and is therefore untimely. The key to resolving this issue is determining at what point in time the 300-day period began to run -- (i) in August of 1995 when the 1996 service rotation schedule was first published, or (ii) in January of 1996 when the service rotation

---

[3] The standards for summary judgment are well known. Summary judgment may be granted when the record contains no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue for trial will be found only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

was actually implemented. If it is the former, then this act is indisputably time-barred. If it is the latter, then it clearly is not.[4]

The Foundation relies almost exclusively on the Supreme Court's decision in *Delaware State College v. Ricks*, 449 U.S. 250, 258-59 (1980), arguing that *Ricks* stands for the well-established proposition that the limitations period begins to run at the time the discriminatory action is communicated to the employee even if the full consequences of that action are not felt until a later time.[5]

Plaintiff argues that *Ricks* is not applicable and believes that the Seventh Circuit's decision in *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) is more on point. We fail to see how this decision helps him. In *Cada*, the Seventh Circuit affirmed summary judgment on limitations grounds. Therefore, the result certainly does not favor plaintiff. As best we can tell, plaintiff is relying on certain general comments made by Judge Posner, in which he stated that the limitations period does not run until the defendant takes some "action." *See id.* at 449. This language is uncontroversial and does not alter the basic analysis here. If anything, *Cada* reaffirms the general point of *Ricks*. As Judge Posner pointed out, "*Ricks* establishes that it is the date of firing or other adverse personnel action, *not the date on which the action takes effect and the plaintiff is terminated*, that – provided it is communicated to the employee [] – is the date of

---

[4]The relevant dates are more fully set forth in our prior ruling. *See* 1/19/99 Order.

[5]In *Ricks*, the plaintiff was a college professor who was told that he would not receive tenure but who was allowed to work for another year. The Supreme Court held that the alleged discrimination occurred at the time the tenure decision was made and communicated to the plaintiff. The fact that the original decision denying tenure could have been reversed in certain appeal processes did not toll the limitations period. *Id.* at 260.

-6-

accrual." *Id.* at 453 (emphasis added); *see also* Lindemann & Grossman, *Employment Discrimination Law*, 3rd Ed., Vol. I at 563 (courts following *Ricks* have held "that the alleged discriminatory act occurs on the date the employee received notice of the adverse decision, rather than on the date the decision took effect or when internal appeals or dispute-resolution mechanisms had run their course").

In sum, the relevant point in time is when the adverse decision was made and communicated to plaintiff. Plaintiff has not provided any credible evidence to rebut the fact that the Foundation made the decision to omit him from the 1996 schedule in August of 1995, that he learned about the decision at that time, and that he believed at that time that the decision was motivated by age discrimination.

Plaintiff half-heartedly attempts to suggest that it is not actually clear that he was removed from the service rotation schedule in August of 1995. The only evidence he points to is a statement he made at one point in his deposition to the effect that the best he could recall was that he was not removed from the service rotation schedule until January 1996. Defendant points out that plaintiff elsewhere in his deposition stated that the decision was made sometime *before* January of 1996. In any event, plaintiff's conflicting deposition testimony is really irrelevant in light of the fact that plaintiff's counsel wrote a letter in August of 1995, in which he clearly and unequivocally stated that plaintiff believed at that time that he had already been removed from the 1996 schedule. There is no evidence whatsoever to suggest that the decision in August of 1995 was preliminary or somehow not final. For the above reasons, we hold that the claim of age discrimination based on the removal from the 1996 service rotation schedule is barred under the applicable 300-day limitations period.

## B. The Proposed Assignment To Head The VALMC Laboratory.

The second act of discrimination still potentially in this lawsuit is the proposed assignment to head the VALMC laboratory in February 1996. This act is not outside the 300-day limitations period so the Foundation does not attack it on this ground. Instead, the Foundation's main argument is that this proposed assignment cannot be considered a materially adverse employment action, which is a prerequisite for maintaining an ADEA claim. The Seventh Circuit summarized this requirement as follows:

> No actionable claim for retaliation or discrimination will lie unless the plaintiff has suffered some adverse employment action. *See Cheek v. Peabody Coal Co.*, 97 F.3d 200, 204 (7th Cir.1996); *Smart v. Ball State Univ.*, 89 F.3d 437, 440 (7th Cir.1996). [] Although we have defined the term broadly, the adverse job action must be "materially" adverse, meaning more than "a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993). We have explained, "a materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.*; *see Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268-69, 141 L.Ed.2d 633 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

*Ribando v. United Airlines, Inc.*, 200 F.3d 507, 510-511 (7th Cir. 1999).

The Foundation argues that the reason the offer to work as the head of the VALMC laboratory cannot be considered a materially adverse action is the simple fact that Dr. Talano refused the offer.[6] We think that this refusal to accept the job is determinative on the materiality question and thus there is no further need to evaluate whether the job itself would have been

---

[6]In a memo dated February 14, 1996, Dr. Talano notified Dr. Bonow that he rejected the proposed assignment.

-8-

materially adverse, if taken, nor whether there was a discriminatory motive behind the decision. Simply put, if plaintiff had the right to refuse the new job assignment and in fact did refuse it, then we do not see how any reasonable person could say that it was materially adverse to be *asked* to take a job that itself may (or may not) be an adverse action. We therefore now grant summary judgment on the entire ADEA claim.

## II.   Breach Of Contract Claim.

We now turn to the state law breach of contract claim, which both parties agree is governed by Illinois law.[7] This claim is based on the same general acts that formed the basis of plaintiff's now-dismissed ADEA claim. To summarize, they consist of the following: (i) the removal of plaintiff as the medical director of the echocardiography unit and laboratory; (ii) the removal of plaintiff as the Lester B. and Francis T. Knight Professor; (iii) the two salary reductions; (iv) the reassignment of plaintiff's secretary; (v) the change in office: (vi) the removal of his name from the service rotation schedule; and (vii) the offer for him to work as director of the VALMC laboratory. Plaintiff claims that these actions breached the 1982 letter agreement.

Defendant generally argues that plaintiff cannot point to any term in the letter agreement that specifically prohibits any of the above actions. Plaintiff has two arguments in response. First, he relies on parole evidence and a course of dealing to try to establish that he had a specific contractual right to be the medical director of the echocardiography unit and laboratory. As to all the other actions, he concedes that there is no contractual provision prohibiting them. Second, he

---

[7]Jurisdiction over this claim is based on both supplemental and diversity jurisdiction.

argues that all of the above actions taken together constitute a constructive discharge in violation of the contract.

We start with a description of the agreement in question. As noted above, it is a four-page, single-spaced letter agreement signed by both parties. It is written in a formal manner with numbered paragraphs and many of the clauses typically included in formal contracts. It includes, for example, a choice of law clause and an integration clause stating that this agreement supersedes any other oral or written agreements between the parties. It also contains a duration clause.[8]

In several places, the agreement refers to and incorporates an attached schedule, which was supposed to contain the specific details of the contractual terms generally referred to in the agreement. Paragraph 1, which is one of the key provisions in dispute, states that plaintiff's "duties" are "enumerated" in Schedule 1:

> You are associated and employed in accordance with this Letter Agreement. Your duties, which will include teaching, research and clinical practice, as mutually agreed, are enumerated in Schedule 1, which is attached hereto, and made a part hereof by this reference.

Likewise, Paragraph 2 states that plaintiff's compensation and benefits are set forth in Schedules 2 and 3:

> The Foundation will compensate you for your services at an annual salary together with certain fringe benefits as more fully enumerated in Schedule 2, which is attached hereto and made a part hereof by this reference. Further, the benefits of said employment are more fully enumerated in the Employee Manual and are

---

[8] The agreement was to last one year beginning on January 1, 1982. Thereafter, it would automatically renew for one-year terms unless terminated by either party pursuant to the by-laws of the Foundation. Of course, as noted above, plaintiff did not sign the agreement until June 1, 1982, even though the agreement supposedly became effective on January 1, 1982.

captioned in Schedule 3, which is also attached hereto and made a part hereof by this reference, wherein indicated medical meeting time, professional expenses, malpractice insurance coverage, pension and profit sharing benefits, group term insurance, life and health and disability insurance, among others.

At this point, the agreement seems to contain all of the requisites to constitute a binding contract. There is one problem. For some unexplained reason, the parties never attached any of the schedules referred to in paragraphs 1 and 2.[9]

The failure to attach these schedules means that a number of the key terms of the agreement are not defined. In their briefs, the parties focus specifically on the question of plaintiff's duties, which were to be "enumerated" on Schedule 1. Plaintiff is arguing that one of those duties was the job of medical director of the echocardiography unit and laboratory, and he wants to use parole evidence to prove this point.[10] The basis for bringing in parole evidence is that the letter agreement is supposedly ambiguous as to plaintiff's job duties given that Schedule 1 was never attached.

We do not believe that plaintiff may use parole evidence to "fill in" this missing term. The reason is set forth in *Bartsch v. Gordon N. Plumb, Inc.*, 485 N.E.2d 1105 (Ill. App. Ct. 1985), a case with very similar facts, in which the Illinois Appellate Court considered and rejected the same argument made by plaintiff here. In *Bartsch*, the parties entered into a lease agreement that

---

[9]The parties both seem to agree that the schedules were *never* attached. Thus, this is not a case where the schedules were attached initially but then the parties were unable locate them later.

[10]This evidence consists of his own deposition testimony. Plaintiff testified that, at the time of the formation of the contract, he received a letter from the then-president of the Foundation. In that letter, the president allegedly stated that plaintiff had the right to be a medical director. Plaintiff does not have a copy of this letter, however.

stated that the rent term was to be set forth in an attached Exhibit B. The trial court ruled in favor of the plaintiff, holding that the Exhibit B referenced in the body of the agreement was not attached at the time of the signing of the contract. On appeal, the defendants argued that the trial court should have considered parole evidence as to the missing rent term. Specifically, they argued

> that the absence of the rental amount was an "ambiguity" which could have been resolved by the admission of parole evidence; accordingly, the court should have supplied this missing term by reference to evidence concerning the lease negotiations and the conduct of the parties subsequent to the execution of the lease.

*Id.* at 1111. This is exactly the argument Dr. Talano is making here.

The appellate court rejected this argument, holding that this particular lease was "not ambiguous," but instead was "missing an essential term, which cannot be supplied by parole evidence." *Id.* This same result applies here. Plaintiff cannot rely on parole evidence to supply the missing term as to his specific job duties because that term is a central term in the contract. *See J.F. McKinney & Assocs., Ltd. v. General Elec. Inv. Co.*, 1998 WL 729637, * 5 (N.D. Ill. Oct. 16, 1998) ("The notion of explaining ambiguities in a contract by parole evidence cannot be used to supply missing and essential provisions.").

Even if we allowed plaintiff to rely on parole evidence, he still would have to overcome several additional obstacles. First, the job of medical director was one that ultimately had to be approved by the Hospital, even though the Foundation apparently made the initial recommendation for the job. Thus, we do not see how the Foundation could have specifically promised plaintiff that he would be the medical director when the Foundation did not have the final say-so over who would get that job.

Second, plaintiff's parole evidence consists of testimony about a letter allegedly written during contract negotiations by the then-president of the Foundation. This evidence thus does not go to the question of what was to be included on Schedule 1, which is the hook plaintiff is relying on to justify bringing in parole evidence. Instead, the proffered evidence concerns what can be fairly described as a side letter agreement, one attempting to add additional terms to the main letter agreement. As such, this side letter agreement violates the integration clause contained in the main letter agreement, which states: "[t]his Agreement constitutes the entire agreement between the parties and contains all of the agreements between the parties with respect to the subject matter hereof; this Agreement supersedes any and all other agreements, either oral or in writing between the parties hereto with respect to the subject matter hereof." (¶ 9(a).)

In addition to these problems, plaintiff still faces the problem that the agreement has no specific salary term. Plaintiff's parole evidence relates solely to his job duties and does not relate to the question of his salary and benefits. In his response brief, plaintiff even conceded that the agreement, by virtue of the failure to attach the relevant schedules, does not guarantee him a right to a specific salary. Thus, at a minimum, this letter agreement is missing this essential term relating to salary. *See Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991) ("A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract.").

Finally, we do not think the above analysis is changed in any significant way by the fact that plaintiff occupied the position of medical director before the contract was signed and continued in that position for many years thereafter. Plaintiff simply has not pointed us to any

-13-

case law to support his argument that his years of work as medical director meant that he had a guaranteed right to continue in that role. Plaintiff also had the same secretary and office for many years, yet, as to those things, he concedes that he had no implied contractual right to keep them. Likewise, he admits that he had no implied right to continue to receive the same salary he received when he first started working.

In sum, for all of the above reasons, we hold that this agreement does not contain the essential terms needed for plaintiff to meet his burden of showing that a binding contract existed, much less to show that the agreement contained the specific right to be the medical director. *See Reese v. Forsythe Mergers Group, Inc.*, 682 N.E.2d 208, 213 (Ill. App. 1997) (plaintiff, as party seeking to enforce the contract, has a burden of establishing the existence of the contract). This holding thus eliminates the need to evaluate plaintiff's constructive discharge argument, which is premised on the existence of an enforceable contract.[11]

---

[11]Even if we were to consider this constructive discharge argument, we would reject it because the acts complained of do not meet the high standard for establishing a constructive discharge, even when those facts are construed in plaintiff's favor. *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996) (the employee must show that "his working conditions were so intolerable that a reasonable person would have been compelled to resign."); *see generally Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) (summarizing the various fact patterns that have, and have not, met this high standard). Moreover, we are not sure whether the constructive discharge analysis relied on by plaintiff, which rests on cases interpreting a constructive discharge under federal discrimination statutes, even applies to a breach of contract claim under Illinois law. Plaintiff has not pointed to any Illinois case establishing this connection.

## CONCLUSION

For the reasons set forth above, this court grants defendant's motion for summary judgment. This is a final judgment.

**ENTER:**

_____
JOHN A. NORDBERG
Senior United States District Court Judge

DATED: August 3, 2000